Thanks to both counsel, and we'll move on to the seventh case, U.S. v. Miller, Christian Nelson. May it please the Court, my name is Christian Nelson, and I represent the defendant appellant, Dion Miller. The District Court erred when it concluded that the police had probable cause to arrest Mr. Miller without a warrant on April 2, 2014, and as a result erred in denying Mr. Miller's motion to suppress evidence seized from his person as incident to that warrantless arrest. First, the District Court found, as a matter of law, that the confidential informant was not reliable, and this finding cannot be overstated. She cannot be trusted. Upon finding the C.I. unreliable, the District Court erroneously found the additional independent confirmation and personal observations observed by the police provided enough information to establish probable cause. Yet the only facts provided by the C.I. that the police confirmed was that Mr. Miller arrived on an Amtrak train on March 4, 2014, and a physical description. In its brief, the government concedes that the police only corroborated some of the information provided by the C.I. The police did not confirm that the C.I. correctly identified where Mr. Miller was staying. The police did not confirm if the C.I. actually knew the individuals the C.I. claimed were connected to Yo. The police did not confirm if Yo knew the individuals that the C.I. claimed were connected to him. The C.I. never stated that she knew Yo as Mr. Miller. It was the detective that made the connection between Mr. Miller and Yo. The police never confirmed that Mr. Miller asked the C.I. to help him sell drugs. Instead, the police took her word, and we know she is unreliable. And the C.I. never predicted any specific future behavior of Mr. Miller, including how Mr. Miller would arrive in Bloomington on April 2, 2014. The District Court also relied heavily on the personal observations of the police officers. But it is undisputed that not one police officer saw a drug transaction take place between the C.I. and Mr. Miller. They never saw Mr. Miller allegedly going to the bathroom and returning with drugs. Mr. Miller was never observed leaving the alleged location where the C.I. claimed he stayed while in Bloomington. The only thing the officers saw on March 5th were the C.I. and Mr. Miller meeting at a Jimmy John's restaurant and leaving together. And Mr. Miller carrying a Jimmy John's sandwich. The District Court also placed great weight on the search before and after of the C.I. But this incomplete search is not sufficient, and Detective Raysbeck testified to this fact. Detective Raysbeck knew the C.I. had a history of lying to the police. Detective Raysbeck knew the C.I. had a history of hiding money in her crotch area. Detective Raysbeck knew the C.I. had a history of engaging in a drug transaction with the intent of stealing money and not delivering the drugs. But Detective Raysbeck did not search the one place he knew the C.I. hid money. And he did not search inside her shoes or her bra to additional easy hiding places for the C.I. And Detective Raysbeck testified the C.I. very well could have had drugs on her when she met Mr. Miller at the Jimmy John's restaurant. He admitted he did not adequately search the C.I. This court cannot rely on this search to find probable cause. The government in its brief places great emphasis on the phone calls placed by the C.I. to Mr. Miller and Mr. Miller's behavior in conjunction with the phone calls. Once again, Detective Raysbeck never heard Mr. Miller agree to sell the C.I. drugs. The only thing Detective Raysbeck heard was Mr. Miller agreeing to meet the C.I. at a Jimmy John's sandwich shop. Furthermore, Detective Raysbeck testified that after the first phone call placed by the C.I. in which she stated she was with her people, he wanted the C.I. to call Mr. Miller again to discuss Price to offer some kind of information that would confirm this meeting was a drug deal, because the first phone call was not enough. And in the second phone call, while the C.I. may have mentioned Price by stating she needed 100, Mr. Miller never responded. He just hung up the phone. There is no evidence that Mr. Miller even heard this statement. The government asks, why would Mr. Miller show up at a meeting place five minutes after the C.I. phoned? But he agreed to meet her after the first phone call, which had taken place 10 minutes prior. They also met at a sandwich shop. Mr. Miller was hungry. He bought a sandwich. The government asks, why would the meeting between Mr. Miller and the C.I. last only a few minutes unless it was for the transaction the C.I. described? Once again, they met at a sandwich shop. Mr. Miller purchased a sandwich. That is the transaction that took place that day. The government asks, why would Mr. Miller meet the C.I. in person unless he wanted to exchange something with her? This meeting took place at a restaurant. He ordered food. He purchased a sandwich. He met the C.I. in person at Jimmy John's because he was hungry. The government also places great emphasis on the police department's conclusions that a drug transaction occurred at Jimmy John's on March 5th. The government states that in order to find no probable cause, the pre-buy search of the C.I. would have to be discounted. But Detective Raisback testified that the C.I. could have had drugs hidden on her person that day. He has already discounted that pre-buy search. Just because the C.I. returned with drugs and money does not mean the alleged drug transaction took place. Because relying on the words of the C.I. is relying on the words of the C.I. that the district court found to be unreliable. The government argued in its brief that the C.I. would have to put various denominations of money in a place she hoped the police would not search. But the C.I. did not have to have various denominations in places she hoped the police would not search. She only needed a $10 bill. Furthermore, she was instructed to buy a gram of cocaine and she returned with a half gram. The government believes it is highly unlikely that the C.I. would have the forethought or the motivation to lie about a drug deal. But she had every reason to lie and she has done this in the past. The C.I. had everything to gain and nothing to lose. She is a known liar, a drug user, and she needed to provide information to the police in order to save herself. And she is the one that volunteered to be an informant. They did not recruit her. What did the $100 buy? It allegedly bought, it was supposed to buy a gram of crack cocaine and she returned with a half a gram. There were two bags equaling a total of a half a gram. She said she gave her money back, right? As a thank you, after he supposedly yelled at her for being an informant. So it is easy to believe that a known drug user would have drugs on her at work and would be able to stage this kind of setup. None of the cases that the government relies upon supports its argument that the police had enough information to arrest Mr. Miller without a warrant. In United States v. Funches, the DEA actually saw the drug transaction take place. In this case, not one officer saw the drug transaction. In United States v. Gilbert, the arresting officer verified each piece of information provided by the criminal informant. In this case, Detective Raysback only verified that Mr. Miller arrived on a train the evening of March 4, 2014 and the physical description of Yeo and his phone number after the fact. In United States v. Navarro, the police relied upon a CI who had assisted the police in prior arrests and drug seizures. They also had two additional informants. In this case, Detective Raysback had no prior experience with the CI, with the exception of her attempting to steal money during another controlled buy. In United States v. Olivia, the CI had purchased drugs from the defendant on prior occasions and gave more verified details. In this case, the CI had never purchased drugs from Mr. Miller before and gave very few verified details. And in United States v. Rosario, the CI was found to be reliable. And in this case, the district court found the CI to not be reliable. And I think I'm going into my rebuttal, so I'm going to reserve that time. Thank you, Your Honor. Thank you. Mr. Hanna. Good morning. May it please the Court, Counsel. Ron Hanna on behalf of the United States. At the time of Mr. Miller's arrest, the police had sufficient information to give them probable cause to believe that what they observed on March 5th was a drug transaction. This case is not about what the police didn't do. Contrary to Mr. Miller's brief, the police did nothing to corroborate the word of the confidential source. And the complete discount that Mr. Miller suggests, the court found that the confidential source was not reliable at all.  The court indicated specifically that he would be troubled, the court would be troubled if you had to rely solely upon the representations of this confidential source because of her essentially assorted past and history. Which we can see, she had definite problems with her credibility, but the police made their own personal observations and corroboration that established credibility to the accusations that she made. And the claims that she made about being able to buy crack cocaine from Mr. Miller. The corroboration in this case being that there's verification that Yo came in by train. Detective Raysback goes to the Amtrak station and recognizes Yo, recognizes Dion Miller rather that is, from a 2009 drug case. He shows this picture to the confidential source. She says, yes, that's the Yo that I'm talking about. He's the one that indicates that he wants some help selling his cocaine in the Bloomington area. They verify the identification of Mr. Miller. The detective listens in on the phone calls and he hears things that are consistent in his experience in training. That are consistent with a drug transaction and consistent with the representations that the source has made. I'm with my people now, is what the confidential source tells Mr. Miller in the phone conversations. Mr. Miller, the detectives see him arrive within five minutes of the CS telling him on the phone that she needed 100. And there's no response, there's no answer rather, but that not answering is actually a response. If he didn't know what she was talking about, presumably he would have said, what do you mean you need 100? And in the detective's opinion, that's because we're talking about a drug transaction. 100 means $100 worth of whatever the drugs are that you're providing to me at this transaction. Is there a difference between, I mean, 1 gram or half a gram, whatever he got, whatever they got? There was some dispute, I think you were trying, she was saying about, it's supposed to be 1 gram instead of half a gram? Correct. I think what they were expecting was 1 gram. It turned out to be a half gram in two bags. And even the record is somewhat confusing because it talks about 2.2 grams, which according to the representations I believe the detective was making would be a couple hundred dollars worth of crack cocaine. But I think what the detective was saying is the common price for drugs in that area was expecting $100 worth. And the question was raised during the hearing, you know, whether that was a lower amount than expected. And the CS said, yes, I addressed that with Mr. Miller at the Jimmy John's. He said, this looks like it's short. And he said, well, it's good stuff. So there was some explanation as to why there was a less than they had expected. But the officers see this, they listen to the phone calls, they verify the identity, they are observing with surveillance the transaction, the truncated phone calls in conjunction with this being a very brief meeting where she searched beforehand, she's given the money, $100 and $20 bills, she comes back without that money and having a half gram of crack cocaine in two bags in a different denomination. There are all indications and corroboration that the police believe that this is what it was. This is a drug deal, all which was arranged, the time, the place, the location, all arranged by Detective Raysback, which takes it out of the ballpark of realistic plausibility that this is something that the confidential source had made arrangements to somehow set up Mr. Miller. So there is sufficient independent corroboration. Yes, we prefer warrants. They're not required. I see that the light is on. In closing, if there are no questions, we stand on the arguments that were submitted in the government's written brief and ask that this court affirm the... You know that's just your warning. My warning. Well, I would still, if there are no questions, Your Honor. I have no questions. None for me. Thank you. And we would ask that the lower district court's decision be affirmed. Thank you. Ms. Nelson? Thank you, Your Honor. We have to look at the observed behaviors and actions of Mr. Miller, not the CI, because we know she has lied in the past and we know she is not trustworthy. She is down here. More information needed to be gathered in order to get this to be a trustworthy tip. And when, on a hunch, Detective Raysback went to the Amtrak station to arrest Mr. Miller on April 2, 2014, he knew five things. He knew that Mr. Miller arrived on the Amtrak train on the evening of March 4, 2014. He knew that Mr. Miller went by the nickname Yo. He knew Mr. Miller's phone number. He knew that Mr. Miller met the CI at a Jimmy John's restaurant on March 5, and Mr. Miller left with a sandwich. Now, one of these facts, either alone or together, is indicative that a drug deal took place on March 5, 2014. This court must find that more is needed than Detective Raysback's hunch that a crime occurred on March 5, 2014 and reverse the district court's denial of Mr. Miller's motion to suppress, and it's finding that the police had probable cause to arrest Mr. Miller without a warrant. Thank you. Thank you, Ms. Nelson. You were appointed, were you not? Yes, I was. You have the deep thanks to the court for the work on behalf of the court and the defendant. You've done a noble job. Thank you. The case will be taken under advisement.